**CALIFORNIA MOLASSES COMPANY, Plaintiff-Appellant,**

v.

**CALIFORNIA AND HAWAIIAN SUGAR COMPANY, Defendant-Appellee.**

No. 9–37.

Temporary Emergency Court of Appeals.

Argued Feb. 16, 1977.

Decided March 16, 1977.

not be accorded privileges which are denied to other United States citizens.

David M. Wilson and Alvin H. Pelavin, Dinkelspiel, Pelavin, Steefel & Levitt, San Francisco, Cal., for plaintiff-appellant.

Martin Anderson and Lynn H. Pasahow, McCutchen, Doyle, Brown, & Enersen, San Francisco, Cal., for defendant-appellee.

Before CHRISTENSEN, ESTES and JAMESON, Judges.

JAMESON, Judge:

This is a private enforcement action brought pursuant to § 210 of the Economic Stabilization Act of 1970, as amended,[1] by plaintiff-appellant, California Molasses Co., (CalMol), a wholesale purchaser of blackstrap molasses, against defendant-appellee, California and Hawaiian Sugar Company (C & H), an agricultural cooperative distributor. CalMol alleged that during the year 1973 C & H charged CalMol prices for molasses in excess of the price ceilings permitted by Phase III and Phase IV regulations of the Cost of Living Council (C.O.L.C.). CalMol sought recovery of the alleged overcharges, trebled in accordance with statute.[2]

Prior to trial the district court granted summary judgment in favor of C & H on the Phase III claims. Following trial on the alleged overcharges on the Phase IV claims, extending from October, 1973 through December, 1973, the court entered judgment for C & H, supported by detailed findings of fact and conclusions of law. In its findings, the court first fairly summarized the history of price controls under the Economic Stabilization Act of 1970 as follows:

> In August, 1971, the President ordered a comprehensive 'freeze' of all prices. Executive Order 11615, 36 Fed.Reg. 15727, August 15, 1971. This freeze lasted until

---

1. Pub.L. No. 92–210, 85 Stat. 748; 12 U.S.C. § 1904 note.

2. Economic Stabilization Act § 210(b)(1), 12 U.S.C. § 1904 note.

November, 1971, and came to be known as Phase I. From November, 1971, to January, 1973, prices were controlled, but under a flexible system, which allowed price increases that could be justified by increased costs. This period of controls was known as Phase II. Executive Order 11627, 36 Fed.Reg. 20139, October 16, 1971; 6 C.F.R. § 300.1 *et seq.* (1973). Phase III was a period of primarily 'voluntary' controls, lasting from January, 1973, until June, 1973. 6 C.F.R. § 130.1 *et seq.* (1974). This was followed by another brief freeze. In September, 1973, prices were again brought under flexible controls which allowed cost-justified increases. 6 C.F.R. 150.1, *et seq.* This was known as Phase IV.

See also *Longview Refining Co. and Crystal Oil Co. v. W. R. (Bill) Shore, et al.,* 554 F.2d 1006 (Em.App.1977).

As the district court noted, it was undisputed that "C & H substantially increased its prices to CalMol during both Phases III and IV. During Phase II, C & H charged CalMol from $24.50 to $25.75 per short ton (85° Brix; Stockton). During Phase III, C & H charged CalMol from $44.00 to $55.50 per short ton (85° Brix; Stockton). During Phase IV, the price charged to CalMol by C & H ranged between $63.50 and $67.00 per short ton (85° Brix; Stockton)."

## I. SCOPE OF REVIEW

■ Since both Phase III and Phase IV claims involve interpretations of applicable statutes and regulations by the Cost of Living Council and the Internal Revenue Service, the agency charged with the enforcement of the price regulations, we consider at the outset the weight to be given their rulings and decisions, as well as the findings of fact of the district court.

As the district court noted, this court recognized in *University of Southern Cali-*

fornia v. Cost of Living Council, 472 F.2d 1065, 1068 (1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), "It is a well settled principle that the courts place great weight on the interpretations given to statutes and regulations by those agencies charged with the responsibility of administering them".[3] In that case the interpretation was contained in a telegram from the Regional Director of the Office of Emergency Preparedness, the agency at that time primarily responsible for enforcement of the Economic Stabilization Program.

In *Fry v. United States,* 421 U.S. 542, 546, n. 6, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975), the Court, in referring to interpretations of the Economic Stabilization Act by "various stabilization agencies", said, "We have long recognized that the interpretation of a statute by an implementing agency is entitled to great weight", citing *Udall v. Tallman, supra.*

With respect to findings of the district court, this court in *Evans v. Suntreat Growers & Shippers Inc.,* Em.App., 531 F.2d 568, 571 (1976) quoted from *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969):

The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.' Citing *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) and other cases.

## II. PHASE III CLAIMS

On October 31, 1972 during Phase II, C & H wrote the Price Commission requesting an exception to the "ceiling price for Hawaiian molasses".[4] The letter stated that C

---

**3.** Citing *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) and *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). See also *United States v. Lieb,* 462 F.2d 1161 (Em.App.

1972); *Stockton v. Lucas,* 482 F.2d 979, 981 (Em.App.1973).

**4.** A regulation under Phase II (6 C.F.R. § 305.-30) allowed exceptions "for the purpose of preventing or correcting a serious hardship or gross inequity".

& H was not asking for "an exemption from economic controls because we believe that such an exemption should be granted only on an industry wide application". On December 20, 1972, the Price Commission entered an order that the request of C & H "to raise the price of cane molasses in excess of justified allowable cost, pursuant to Price Commission Regulation 6 C.F.R. 300.-12, in order to maintain its customary margin to the prevailing wholesale price, is denied". The Commission found, *inter alia,* that C & H had not "demonstrated that compliance with Price Commission Regulations results in serious hardship or gross inequity for the Company, or members of its agricultural marketing cooperative".

On January 11, 1973, Phase III was initiated by Executive Order 11695, 38 Fed.Reg. 1473, which provided in pertinent part:

Sec. 3. (a) All orders, regulations, circulars, rulings, notices or other directives issued and all other actions taken by any agency pursuant to Executive Order 11588, as amended, Executive Order 11615, as amended, Executive Order 11627, as amended, and Executive Order 11640, as amended, and in effect on the date of this order are hereby confirmed and ratified, and shall remain in full force and effect as if issued under this order, unless or until altered, amended, or revoked by the Chairman . . ..

\* \* \* \* \* \*

(d) Renegotiation provisions in price, rent, wage or salary contracts which are dependent for their operation on modification or termination of the Economic Stabilization Program are hereby declared inoperative as unreasonably inconsistent with the goals of the Economic Stabilization Program. Except to the extent permitted pursuant to the provisions of section 4(a), this order shall not operate to permit:

(i) A retroactive increase in prices, rents, wages or salaries for goods or services sold or leased or work performed while the prices, rents, wages or salaries were subject to the rules of the Price Commission or the Pay Board, or

(ii) A prospective increase in prices, rents, wages or salaries under the terms of a contract subject to a Price Commission or Pay Board decision and order, except to the extent consistent with such decision and order.

On January 17, 1973 C & H increased the price of molasses to CalMol. On January 24 the attorney for CalMol wrote the Cost of Living Council protesting the price increase and requesting "urgent determination" of the legality of the increase.[5] On January 26, 1973 animal feeds (including blackstrap molasses, which is an animal feed rather than human food) were held to be exempt from mandatory controls during Phase III (CLC Release # 197, CCH Economic Controls § 871.10).

CalMol urged in the district court, as it does here, that the order of the Price Commission, entered during Phase II, was carried forward into Phase III by Executive Order 11695 and that C & H's price increase accordingly was illegal. Following a hearing the court granted C & H's motion for summary judgment, concluding that the order denying C & H's request for an exception was "not the kind of order . . . contemplated to be carried over into Phase III".[6]

The effect of Executive Order No. 11695 was considered by this court in *United States v. California,* 504 F.2d 750 (Em.App. 1974), with respect to wage and salary in-

---

5. The record does not show that any action was taken by the Price Commission in response to this letter.

6. In further explanation of its ruling, the court said:

I have pretty well reached the conclusion the order made in Phase II denying the application of C & H was an order limited to C & H, not a general order in any way, not an order involving particular unusual circumstances or factors that ought to make it an order carrying over the Phase III, which seems to me are the characteristics of the order upon which you rely as to carryovers, those two paragraphs referred to.

creases disallowed by the Cost of Living Council. In dismissing the complaint the court held that California was acting under voluntary controls and had violated no agency regulation or order, the court stating that "the only way that the regulations could be violated was to pay an increase which had already been challenged and specifically disapproved by the agency". 504 F.2d at 757. With reference to Executive Order 11695 we said, "Because economic controls were thereby made voluntary and self-administering, it was no longer a violation of the Act to agree to pay or induce and require to be paid wages in excess of CLC guidelines". 504 F.2d at 757, n. 11.

The standards under Phase III here applicable are "standards for private behavior which are intended to be applied voluntarily". 6 C.F.R. § 130.11. Phase III regulations adopted by the Cost of Living Council superseded the provisions of Chapter III (Price Commission Regulations) except "with respect to the food industry, the health industry, and the construction industry". 6 C.F.R. § 130.1(a). In C.O.L.C. Release No. 197 issued January 26, 1973 it was expressly provided that "animal feeds are not subject to mandatory controls".

The policy of C.O.L.C. with respect to possible imposition of mandatory controls during Phase III was explained in its Release No. 217, dated February 28, 1973:

Q. What actions can the Cost of Living Council take during Phase III when it discovers violations of the Economic Stabilization Program regulations?

A. . . . [T]he Council may prospectively reimpose mandatory controls over any sector of the economy if mandatory controls would further the goals of the program. After the reimposition of mandatory controls, conduct which is not in accordance with those rules is subject to both administrative and judicial sanc-

tions . . . .. CCH Economic Controls § 871.25 at 881.

At no time during Phase III did the C.O.L.C. take any steps to reimpose mandatory controls over the sale of molasses, or impose any sanctions on C & H with respect to the price increases of January 17, 1973.

We agree with the district court that the order denying an exception to C & H during Phase II was not the type of order which was carried over into Phase III by Order 11695.[7] It was not an order of general application to all sellers of molasses and simply denied an exception to C & H during Phase II. The price increase under Phase III was not an increase which "had been challenged and disapproved". In sum, no mandatory controls were in effect with respect to the sale of molasses during Phase III. Summary judgment in favor of C & H was proper on the Phase III claims.

### III. PHASE IV CLAIMS

#### A. *Review by Internal Revenue Service*

■ The findings of the district court include the following:

On two separate occasions relevant to this suit, the Internal Revenue Service ('IRS') reviewed the compliance of defendant C&H with the regulations of the Economic Stabilization Program. During this period, the IRS was the body charged with enforcing compliance with the terms of the program. In September, 1973, C&H submitted to the IRS its 'merchandise pricing plan', pursuant to 6 C.F.R. § 150.306(a), describing how C&H would price its molasses in order to comply with Phase IV regulations. The IRS reviewed the 'plan', and replied by letter:

We have reviewed the Merchandise Pricing Plan submitted by your firm, dated 9/14/73, and have determined that it meets the requirements of Subpart K of the Economic Stabilization

---

7. This is consistent with C.O.L.C. Phase IV Ruling 1973–8, 38 Fed.Reg. 31976 (Nov. 16, 1973), which reads:

As a general rule, an exception granted in a prior phase of the Economic Stabilization Program does not continue in effect in a subsequent phase. This rule applies because of the great likelihood that either the regulation with respect to which the exception has been changed or that the conditions and circumstances under which the exception was granted have changed.

Regulations. You may continue to adjust prices in accordance with your plan. . . .

Exhibits 53 and P. In January, 1974, an IRS Investigator, Mr. McReynolds, conducted a field audit of C&H's books and records. Mr. McReynolds consulted a person on the IRS technical staff specializing in food products, R. Toller, and concluded that C&H was in compliance with applicable Phase IV regulations. The IRS notified C&H by letter that except for an error not at issue in this suit,

> [i]t has been determined from the records examined during the investigation that C&H Sugar Company is in compliance with Phase IV regulations
> . . . . .

Exhibit U.

CalMol argues that the IRS rulings were routine reviews by local personnel and accordingly were of a type or level not entitled to the deference customarily given to administrative agency determinations. The IRS, however, was charged with enforcing the price controls and its agents did have delegated authority and expertise in reviewing price control compliance.[8]

It is clear from a review of the record that the investigation and field audit of the IRS were detailed and thorough. The merchandise pricing plan was reviewed by a 23 man team which conducted 55 investigations during a five month period. (Tr. pp. 415–419). It was supervised by an agent with 13 years experience and two years experience conducting compliance investigations. The subsequent audit was conducted by an agent who was a C.P.A. and resulted in 115 pages of work product, consisting of charts and graphs of financial data and other data with respect to C & H's sales plan. This agent had conducted over 100 such investigations over a nine month period. While review reports were initially forwarded to the Cost of Living Council in Washington, D. C., at the time of the C & H investigation the district office of the IRS had jurisdiction and made its decision without sending its reports to Washington. (Tr. pp. 417–418).

The following facts are also significant in determining the weight to be accorded the findings and conclusions of the IRS:

The Phase IV regulations applicable to C & H's molasses sales to CalMol became effective on September 10, 1973, 6 C.F.R. §§ 150.601–150.609. The letter from the IRS approving C & H's merchandise pricing plan was dated October 26, 1973. On November 2, 1973 C & H informed counsel for CalMol by letter that C & H had received approval of the plan and that the price for molasses would continue to be determined in accordance with the plan. (Ex. Q). On January 21, 1974 CalMol, through its counsel, made demand on C & H for alleged overcharges (Ex. 47). On April 19, 1974 C & H wrote counsel for CalMol that it had "reconfirmed the fact that California and Hawaiian Sugar Company had fully complied with the provisions of the Economic Stabilization Act of 1970, as amended". (Ex. 48).

On May 13, 1974 counsel for CalMol wrote the Cost of Living Council in San Francisco requesting an investigation of the prices charged CalMol by C & H. (Ex. 41). A response from the Chief Review Appeals Section, District Director IRS, dated May 30, advised counsel that with the expiration on April 30 of the Economic Stabilization Act the district office was in the process of closing, and CalMol's letter was being forwarded to the Cost of Living Council in Washington, (Ex. 42).

We find merit in C & H's contention that CalMol did not protest the prices charged by C & H during Phase IV or request any

---

8. Pursuant to CLC Order No. 37, 38 Fed.Reg. 21836 (Aug. 13, 1973) the IRS was delegated the enforcement power for stabilization act problems. This broad power included the power to "[m]ake decisions and issue orders with respect to . . . merchandise pricing plans," and to "issue . . . interpretations of price stabilization regulations". Moreover, the San Francisco IRS office was a "key district office". See IRS Delegation Order No. 140, 38 Fed.Reg. 22420 (Aug. 20, 1973).

further investigation until May 13, 1974,[9] long after the sales in question had been made and after price controls had ended. The only potential recipient of any benefits would be CalMol rather than its customers.[10]

## B. *Alleged Violations of Phase IV Regulations*

As the district court noted, the parties agree that C & H was required to meet two tests before it could raise prices during Phase IV—the "gross margin test" and the "profit margin test". CalMol contends that C & H failed to meet either test and also failed to comply with requirements applicable to "market risk-sharing transactions".

### 1. *Applicable Regulations*

Applicable regulations are found in Subpart K and Subpart Q of Part 150 of the Code of Federal Regulations. Subpart K sets forth the price rules for retailers and wholesalers:

> A price category . . . firm [C & H] may not increase the price of any item above the adjusted freeze price for that item, until it submits the merchandise pricing plan required by § 150.306(a) . . . . (6 C.F.R. § 150.304(a).)
> "Except as provided in paragraph (e) of this section, a firm which increases the price for any item above the adjusted freeze price for that item must control the prices it charges for the category in which the item falls so that—(2) For any fiscal year the . . . gross margin for that category does not exceed the . . . gross margin realized for that category during the pricing base period; and (3) The firm's profit margin for any fiscal year in which the increased price is

charged does not exceed its base period profit margin. . . ." (6 C.F.R. § 150.304(c).)

Under these regulations C & H, a wholesaler, was required to meet the gross margin and profit margin tests before it could lawfully raise its prices during the Phase IV period. As the district court properly found, C & H did submit and obtain approval of the merchandise pricing plan required by § 150.306(a).

In addition to the Subpart K regulations, the following Subpart Q regulations are applicable:

> This subpart applies to all firms engaged in food manufacturing, food service activities, food wholesaling and food retailing. (6 C.F.R. § 150.602.)

> Except as provided in paragraph (b) of this section [not applicable], Subpart K of this part applies to the wholesaling and retailing activities of firms subject to this subpart. (6 C.F.R. § 150.604(a).)

> A marketing cooperative as defined in § 150.204(b) is subject to the pricing rules in § 150.606 with respect to its food manufacturing activities. For purposes of computing food raw material costs, a marketing cooperative shall use the imputed allowable costs determined in accordance with § 150.204(d).[11] (6 C.F.R. § 150.609(a).)

### 2. *Gross Margin Test*

As the district court found, in complying with Subpart K regulations, C & H computed its gross margin by the appropriate formula, as defined by § 150.303(b):

9. As noted *supra*, CalMol's counsel on January 11, 1973 had protested the price increase under Phase III, but the record does not disclose any further protests to the Price Commission until May 13, 1974.

10. In fact, CalMol's claim was assigned to Leonard Benjamin prior to the May 13, 1974 letter.

11. 6 C.F.R. § 150.204(d) defines "imputed allowable costs". The district court found that the IRS could reasonably find that imputing costs corresponding to the New Orleans wholesale price "approximated the treatment that C & H would have received under the regulations if it had had to buy outright its molasses for resale, and the IRS could reasonably find that this method was consistent with the over-all goals of the Economic Stabilization Program".

Gross margin is defined in 6 C.F.R. § 150.303(b) as:

$$\frac{\text{Revenues} - \text{Cost}}{\text{Revenues or Cost}} \times 100$$

"Where:

Revenues = Total revenues realized from the sale of merchandise within a category less returns and credits; and

Cost = Total invoice costs of all merchandise within a category plus transportation allocated to that merchandise.

As the district court noted, "Under this system of regulation, it was to the advantage of a firm to calculate its costs during the controlled period at as high a figure as possible so that the gross margin during that period would be as low as possible".

Pursuant to § 150.609(a) C & H imputed its cost of molasses, using the New Orleans price, and then subtracted that cost from revenues in its computation of gross margin.[12] CalMol challenges the right of C & H to use "imputed costs" in this manner,[13] but does not question the correctness of the arithmetical computations.

As the district court found, "The 'merchandise pricing plan' submitted to the IRS by C&H clearly indicated that C&H intended to compute its cost for molasses from the New Orleans price. Exhibit 53, pp. 7–8.[14] The IRS approved this merchandising plan without questioning the propriety of using imputed costs in this fashion. Exhibit P. Relying on the IRS's approval, C&H proceeded to sell molasses to CalMol in accordance with the approved 'pricing plan'." The court concluded that the use of the "imputed cost to calculate gross margin was consistent with Phase IV regulations", citing 6 C.F.R. § 150.609(a), supra.

CalMol argues that the first sentence of § 150.609(a) should be read as a limitation on the second sentence, and that cost imputation should be allowed only with respect to "food manufacturing activities" of the cooperative. The district court found this to be "a strained reading" of the regulation and "no such implication warranted", and read "the second sentence as plainly meaning that 'marketing cooperatives' without

12. This is explained in the findings of the district court:

Farmer-patrons of C&H market their sugar, raw sugar, and molasses through C&H, and C&H returns to them 'net proceeds' that correspond to a 'price' that C&H pays these farmer-patrons for their products. Transcript, p. 497: 19–24. This 'price', however, is set by reference to the money C&H receives when it sells the products to a third party, and is not set at the time the farmer-patrons surrender their products to C&H. In calculating the cost to it of the molasses it later sold to CalMol during Phase IV, C&H did not extrapolate a 'cost' for the molasses from money paid out to its farmer-patrons. Rather, it calculated an 'imputed cost' from wholesale prices on the New Orleans market during that period. Undisputed Facts in Pretrial Order, pp. 5–6.

13. Expert testimony was produced by both parties concerning the meaning of certain accounting terms and principles. As noted by this court in Evans v. Suntreat Growers & Shippers, Inc., 531 F.2d 568, 571 (Em.App.1976), supra:

There was conflicting evidence before the trial court. Appellants rely on the testimony of the expert accountant and his opinions based on the calculations. The appellee relies on the testimony of its accountant. . .

In addition, the documentary evidence was complex, and different interpretations were placed on it by the appellants' and appellee's witnesses.

The trial court was entitled to rely on the evidence favorable to appellee and to credit the testimony of appellee's witness over that of the appellants' witness.

Unless the trial court was clearly wrong in it[s] factfinding, the judgment must be sustained.

14. The plan submitted stated:

As a marketing cooperative, C & H is required by section 150.609(a) to use an imputed allowable cost determined in accordance with section 150.204(d) to compute the gross margin from molasses sales. Section 150.-204(d)(3) authorizes cooperative to use published prices in the Department of Agriculture Market News Service Reports as imputed costs. Accordingly, C & H plans to rely on molasses prices published in 'Molasses Market News' by the Department of Agriculture to establish the imputed allowable cost of molasses.

In the work notes of the IRS, it is stated that C & H was "determined to be a marketing cooperative", and therefore subject to the provisions of 6 C.F.R. § 150.204. (Ex. 53, p. 26.)

limitation shall use imputed costs". We agree with the district court.

CalMol further contends here, as it did in the district court, that molasses is not a "food raw material" as defined in § 150.603, which reads:

'Food raw material' means, in the form in which they are received, raw, semi-processed or processed agricultural and marine products, including crops, livestock, poultry and catch from fresh water and the sea, and other edible products such as flavorings, preservatives and additives, which are incorporated into the food item concerned.

Recognizing that "the definition is not as precise as it might be", the district court found that "the last phrase, 'incorporated into the food item concerned', is an explanation rather than a limiting part of the definition" and that accordingly "C&H need not have further processed molasses or incorporated it into another product for it to be considered a 'food raw material'". Moreover, § 150.606(c)(4)(i) expressly refers to "food or raw material purchased and resold without change in form".

We agree with the IRS and the district court that the molasses sold by C & H to CalMol was a "food raw material" within the meaning of § 150.604, and that for the purpose of "computing food raw material costs", C & H as a "marketing cooperative" properly used the "imputed allowable costs" pursuant to § 150.609(a).

### 3. *Profit Margin Test*

CalMol contends that C & H violated the profit margin[15] limitation by deducting "patronage dividends" in calculating its net profit margin. The findings of the district court on the deduction of patronage dividends include in pertinent part:

'Patronage dividends' are part of the 'price' paid by C&H to its farmer-patrons in return for their products which have been marketed by C&H. Transcript, p. 497: 115–116: Undisputed Facts in Pretrial Order, p. 2. As in the dispute over the proper method of calculating gross margin, the disagreement over patronage dividends arises because C&H is an agricultural marketing cooperative whose accounting methods do not match those of a conventionally structured firm.

The parties put on conflicting testimony as to the propriety of deducting patronage dividends to arrive at a figure for profit margin. Plaintiff's witness, Dr. Vance, testified that it would not be in accordance with generally accepted accounting principles for a cooperative to deduct patronage dividends as part of the cost of goods sold. Transcript, pp. 156: 21–157:7, 159:8–11. Defendant's witness, Mr. Schmid, testified that patronage dividends should be deducted from net proceeds to arrive at profit margin. Transcript, p. 510:1–9. Mr. Schmid further testified that so far as he was aware there were no generally accepted accounting principles applicable to filings with the Cost of Living Council or the Price Commission. Transcript, pp. 501: 25–502:7.

Mr. McReynolds, the IRS Investigator, specifically considered the question of the proper treatment of patronage dividends when he conducted his field audit of C&H. Transcript pp. 399: 5–401: 20; Exhibit 52, p. 8, and note at bottom of page. After consulting with a specialist in food products on the IRS staff, Mr. McReynolds concluded that C&H had treated patronage dividends properly in deducting them to arrive at a profit margin figure.[16] After Mr. McReynolds' au-

---

**15.** Profit margin is defined in 6 C.F.R. § 150.31 as:

. . . the ratio that operating income (net sales less cost of goods sold and less normal and generally recurring costs of business operations, interest expense on long and short term debt determined before non-operating items, extraordinary items, and income taxes) bears to net sales as reported on the

firm's financial statement . . . prepared in accordance with generally accepted accounting principles consistently applied.

**16.** The court continued:

By implication, the IRS also found that C&H was complying with the requirements imposed by the phrases 'as reported in the firm's financial statement', and 'in accord-

dit was completed, the IRS notified C&H by letter that it had determined that it was 'in compliance with Phase IV regulations.' Exhibit U.[17]

The district court noted that "if patronage dividends could not be deducted, then the profit margin test could have operated unduly harshly on a marketing cooperative, since it could have been penalized merely for an increased volume of sales without an increase in price". The court concluded that the "IRS determination that C&H properly treated patronage dividends in computing profit margin was reasonable under the circumstances", and while the "regulations were ambiguous at best", the court would not "interpose an interpretation contrary to that of the agency charged with interpreting and enforcing them." We agree with the district court. Its finding that the IRS had adopted a reasonable and rational interpretation of the regulation was not clearly erroneous.

### 4. *Market Risk Transactions*

Finally, CalMol argues that C & H failed to comply with the "market risk-sharing transactions" provisions of 6 C.F.R. § 150.-204(c). § 150.204 reads in pertinent part:

This section applies to—

(1) Sales of Products or services by a marketing cooperative . . . for its members and for other persons, and

(2) Transactions for the sale of products or services by a seller to a buyer in which the price is set in whole or in substantial part by reference to the buyer's proceeds from the later resale of the product or service . . . . (6 C.F.R. § 150.-204(a).)

Each transaction of the kind described in paragraph (a)(2) of this section is a 'market risk-sharing transaction' and is considered to bind the buyer and seller of that transaction to a 'market risk-sharing agreement'. The price which is charged in a market risk-sharing transaction is a 'market risk-sharing price'. The total proceeds which a firm receives from a marketing co-operative for a product or service which the co-operative markets for that firm is also a 'market risk-sharing price'. (6 C.F.R. § 150.204(b)(2).)

A market risk-sharing price, as defined in paragraph (b) of this section, may not exceed the price authorized to be charged under any other provision of this part if the kind of product or service and the kind of transaction concerned are not exempt from the Economic Stabilization Program under Subpart D of this part. 6 C.F.R. § 150.204(c).

In holding that the provisions of § 150.-204 were not applicable, the district court said:

The regulations plainly state that a 'market risk-sharing transaction' is a transaction between the original seller and the marketing cooperative acting as its marketing agent. In the context of an agricultural marketing cooperative, this is the transaction between the farmer-patron

---

ance with generally accepted accounting principles consistently applied', of 6 C.F.R. § 150.31. These requirements are badly formulated to cover the situation of an agricultural marketing cooperative such as C&H under the profit margin test, and the Court finds that they can be adapted only with some effort to accommodate the concepts of agricultural marketing cooperative accounting. The Court finds that it would not be justified in insisting on the literal and rigid reading of these requirements suggested by plaintiff's witnesses. Accordingly, insofar as these requirements can be meaningfully applied to an agricultural marketing cooperative under the profit margin test, the Court finds that C&H has complied with them.

**17.** The final report of the I.R.S. stated:

"Profit margin test:

The Company qualifies as a marketing co-operative under section 150.204, and payments to growers qualify as patronage dividends under the Internal Revenue Code, sec. 1388, which is referred to in sec. 150.204. As a result for purposes of the profit margin test, net profit may be measured as net operating profit less payments to growers (authorized under sec. 150.204(c)(1)). *As all net proceeds were distributed to growers in both the base period and the current period, there was no remaining profit margin in either period so therefore there was no profit margin violation.* Tests were made to the Company's records to verify that all net proceeds were distributed in the current period. (Ex. 52, p. 4. Emphasis supplied.)

and the cooperative. 6 C.F.R. § 204(a)(2), (b)(2), (c). Thus, the provisions of this section have no applicability to the transactions complained of here, which were between the marketing cooperative and a third party.

We agree. In the context of § 150.204 the farmer is the seller and C & H is the buyer. C & H in turn resells to CalMol and other customers. The transaction between C & H and CalMol is not covered by this regulation.[18]

Affirmed.

---

**18.** Moreover, as the district court noted, CalMol's contention "conflicts with the IRS's finding, on two separate occasions, that C&H was in compliance with Phase IV regulations". No evidence was presented from which the district court could determine that this IRS determination was clearly erroneous.