**ALLIED PAPER INCORPORATED,**
**Plaintiff-Appellant,**

v.

**UNITED GAS PIPE LINE COMPANY,**
**Defendant-Appellee,**

**and**

**United States of America et al.,**
**Defendants-Appellees.**

**ALLIED PAPER INCORPORATED,**
**Plaintiff-Appellee,**

v.

**UNITED GAS PIPE LINE COMPANY,**
**Defendant-Appellant,**

**and**

**United States of America et al.,**
**Defendants-Appellees.**

**Nos. DC–45, DC–46.**

Temporary Emergency Court of Appeals.

Argued July 19, 1977.

Decided Aug. 18, 1977.

822

S. White Rhyne, Jr., Mullin, Connor & Rhyne, Washington, D. C., with whom Nathaniel F. Emmons, Washington, D. C., and Arthur A. Munisteri, New York City, were on the brief for plaintiff-appellant.

Knox Bemis, Pierson, Semmes, Crolius & Finley, Washington, D. C., with whom W.

DeVier Pierson, David J. Hill and James M. Costan, Washington, D. C., and William B. Cassin and Phillip D. Endom, Houston, Tex., of counsel, were on the brief for defendant-appellee.

Before ANDERSON, INGRAHAM and GRANT, JJ.

ROBERT P. ANDERSON, Judge:

It is generally undisputed by the parties that on May 14, 1964 Allied Paper Inc. (Allied), a corporation organized under the laws of Delaware and a manufacturer of wood pulp in Alabama, and United Gas Pipe Line Co. (United), also a Delaware corporation, a public utility company which operates a pipeline between Texas and Alabama for the transmission of natural gas, entered into a written understanding under the terms of which United was to sell and Allied was to purchase the amount of natural gas needed to operate Allied's pulp mill in Jackson, Alabama. The agreement was to remain operative until January 1, 1983. The monthly rate to be charged by United and paid by Allied varied with the amount of gas consumed by Allied and included an adjustment up or down according to United's weighted average cost for gas in the Jackson, Alabama, area depending upon whether that cost exceeded or was less than a fixed rate or sum stated in the price clause of the agreement which was Article XIV(A) therein.

This provision for price, however, was not to remain operative for the life of the agreement but was to be reconsidered in a little over eight years viz., on January 1, 1973. Article XIV(B) delineated the procedure for determining the new monthly rate for the ensuing five years, that is January 1, 1973 through December 31, 1978. This required United to submit to Allied, "in writing for agreement thereto a monthly rate for gas deliverable," at least 90 days prior to January 1, 1973. After having received notice of this proposed rate,[1] Allied had a duty to inform United, before the commencement of the rate period, whether the newly proposed rate was agreeable to Allied. If Allied did not agree to the new rate proposed by United, the agreement would automatically terminate, except that Allied could elect to pay the new rate to United for such reasonable period as Allied would require to convert its plant from natural gas to a different kind of fuel.

Allied rejected both proposals on the ground that neither was in accordance with the Article (B) provision for proposing new price terms and the rate was objectionable because it was an increase in price in violation of Phase II regulations. United replied on December 22, 1972, by pointing out that rejecting the proposals would cause immediate termination of the contract and by threatening to cease deliveries if Allied did not accept one of the proposals. United stated that if Allied rejected both proposals, it would apply to the Federal Power Commission (FPC) for permission to terminate service. On December 29, 1972, Allied accepted Proposal A. In an accompanying letter, however, Allied renewed its previously stated objections[2] and argued that

---

1. On September 22, 1972, while Phase II controls were in effect, United proposed two new price formulas for the period January 1, 1973, to January 1, 1978. Proposal B was not made pursuant to the agreement but was an offer to amend certain provisions of the agreement, including the price terms. Proposal A established a flat rate of 80¢ per Mcf (thousand cubic feet) for the period from January 1, 1973, to January 1, 1974, and a base rate of 80¢ per Mcf increased by twice any increase in United's weighted average cost for the gas in its system over its December, 1972 cost for the 1974 to 1978 period. Proposal B redefined several key provisions of the agreement regarding the na-

ture, quality and measurement of the gas provided by United and provided that during times of shortage United could curtail deliveries in accordance with its tariff schedule filed with the FPC without liability under the agreement with Allied. Proposal B offered a substantially lower base rate of 55¢ per Mcf for 1973 but thereafter granted United the right to "redetermine" the rate if it found in practice that the existing rate was no longer economically practical.

2. "Further, we hereby state, under protest, our acceptance of 'Proposal A' . . . reserving all our rights, including but not limited to: our right to receive full performance of the contract

because the proposals were not in accordance with Article XIV(B) United had not complied with its obligation to present a new monthly rate. Allied agreed, however, to pay the Proposal A price of 80¢ per Mcf each month from January 1, 1973 until the Price Commission or a court having jurisdiction, decreed otherwise.

On December 29, 1972 Allied commenced a suit in the state courts of Alabama, asserting that United's Proposal A was not in accordance with Article XIV(B) of their agreement, and it sought a declaration that Article XIV(A) remained in effect and demanded a return of all sums paid under protest in excess of that rate. United counter-claimed in the Alabama state court action for the value of the gas provided after January 1, 1973. It asserted that the agreement with Allied terminated on January 1, 1973 because Allied did not effectively accept Proposal A. United applied to the FPC for permission to terminate its service of supplying natural gas to Allied, but United's petition was denied.

Prior to proposing the new rates contained in Proposals A and B above described, United applied for and received a letter from the Price Commission stating that under 6 C.F.R. § 300.308, United could "self-certify" the increases and thereby put them into effect without Commission approval. Allied (and other customers of United) applied to the Cost of Living Council (COLC) for a determination of the legality of United's rate increases. The COLC, however, refused to rule on the merits of Allied's application and declined to intervene in the dispute.

Thereafter, on August 24, 1973, Allied instituted the present action in the federal court under § 210 of the Economic Stabilization Act. During the last months of 1972, Allied had paid on the average approximately 30¢ Mcf. This price term expired at the end of 1972 and the Proposal A price

term imposed by United increased the rate to 80¢ Mcf. Allied asserted in the federal action that this increase was not cost justified and, therefore, violated the Phase II regulations. Allied sought a declaration that the Article XIV (A) rate was the maximum chargeable under Phase II in that it provided for a direct pass-through of United's increased costs. In Allied's opinion, the cost increases provided for in Article XIV (A) were the extent of those permissible under Phase II as cost justified. Allied also claimed damages for the amount that United's 80¢ rate exceeded the Phase II price and asserted that United could not lawfully charge more than the Phase II price for the five-year term of the agreement. Furthermore, Allied alleged that United's price increase constituted an intentional violation of the Act entitling it to treble damages and attorneys' fees under § 210(b).

The action was designated on the docket of the United States District Court for the District of Columbia as Civil 1662–73. On April 22, 1974 the district court dismissed the case because of the failure by Allied to exhaust administrative remedies. That judgment was appealed to this court which reversed the holding on the ground that the plaintiff had done all that it could to invoke action by the relevant administrative bodies and, on their refusal to pass upon the issues, it became the task of the district court to hear and adjudicate them. *Air Products & Chemicals, Inc. v. United Gas Pipe Line Co.*, 503 F.2d 1060 (Em.App.1974). Thereafter a plethora of preliminary motions, including motions by both parties for summary judgment were filed and argued by the parties. It is not necessary to recite the arguments and dispositions made of these motions at this stage of an unnecessarily long, drawn out case, except to mention the essential rulings by the district court, which, in effect, formulated the issues presented to and argued to this court. These rulings are, first, that United could not, on January 1,

by United; our right to obtain a determination in the courts that said Proposal is not in compliance with the contract; our right to obtain in the courts a fair and equitable monthly rate

under the contract; our right to obtain damages . . .; and our right to obtain such relief as may be appropriate in the circumstances."

1973, raise the price to be paid by Allied for natural gas from 30¢ Mcf to 80¢ Mcf without proof of cost justification; and, second, that the President's Executive Order # 11695 issued January 11, 1973 made invalid United's demand for an increase in the price Allied was required to pay to it for natural gas on and after January 1, 1973, under United's interpretation of their agreement, and constituted a renegotiation of the price "dependent for its operation on the termination of the Economic Stabilization Program" prohibited under § 3(d) of the Executive Order. The district court further held that on the basis of these determinations United could not lawfully charge a greater sum than that which was operative at the end of 1972, increased solely by cost justified amounts, which would remain applicable for the five-year agreement term ending January 1, 1978.

As a consequence of these holdings and in view of the pendency of the action between the same parties in the state courts of Alabama, for a declaration of whether Allied's response to United's offer in Proposal A created a contract, the United States District Court was of the opinion that the federal proceeding should be stayed pending the resolution of the issue before the Alabama state courts.

Allied appealed the stay order to this court on the ground that for the purpose of the § 210 claim the question whether a contract existed between the parties was a federal question. United has moved to dismiss the appeal from the stay order on the assertion that the stay order was not an appealable final order under 28 U.S.C. § 1291. United also cross-appealed from the district court's determination that Phase II regulations under the Stabilization Act fixed the lawful price for natural gas deliveries to Allied from January 1, 1973 to January 1, 1978, for the reason that the mandatory controls under Phase II terminated on January 11, 1973. Allied has moved to dismiss United's cross-appeal on its claim that the district court ruling that Phase II governed the maximum price chargeable for the five-year term of the

contract, was not a final appealable decision under § 1291.

■ This court has jurisdiction to maintain the appeal from the stay order as a final decision under the collateral order doctrine enunciated in *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). United's cross-appeal from the district court's holding that Phase II governed the price charged for gas for the five-year term of the agreement is also appealable because a ruling on the scope of Phase II is basic to the decision to stay the federal proceedings. *See*, 9 Moore's Federal Prac. ¶ 110.25[1]; *Jenkins v. Blue Cross Mutual Hospital Ins., Inc.*, 522 F.2d 1235, 1237–38 (7th Cir. 1975), *reheard en banc*, 538 F.2d 164, *modified on other grounds*, *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). The prior decision on the applicability of Phase II was subsumed in the stay order. Unless Phase II controlled the price in long-term contracts after the expiration of the Phase II regulations, the issue of the existence of a binding contract between Allied and United would not be relevant to Allied's § 210 claim. It is appropriate and will assist judicial economy for this court to exercise jurisdiction under § 1291 to resolve the issues raised on both appeals.

■ In ruling that Phase II controlled the price term for the life of the agreement, the district court primarily relied upon the declaration in Executive Order No. 11695 that renegotiation provisions dependent for their operation upon the expiration of Phase II controls were invalid. Section 2 of Proposal A provides that if the 80¢ rate is in excess of the amount allowed to be charged under federal regulations, then the applicable rate under the agreement is the maximum amount chargeable under the regulations. Such a provision is the equivalent of providing for an automatic price increase upon the expiration of Phase II. As the COLC ruled in Phase III Ruling 1973–2 such an automatic price increase has the same effect as a renegotiation provision and, therefore, is inoperative under Execu-

tive Order No. 11695. If the Executive Order is given its intended effect in this case, United will be bound to the maximum price chargeable under Phase II for a reasonable period following the end of Phase II when, presumably, the acute danger of resurgent inflationary pressures will have subsided.

Before any unreserved statement is made that the Executive Order effectively extends price controls through 1977, almost five years after the expiration of Phase II and more than 3½ years after the expiration of the Act, as Allied argues, it is necessary first to examine the limited purposes of the Act and determine whether such an application of the Executive Order will go beyond anything Congress intended in delegating price control powers to the President. The congressional findings adopted as part of the 1971 amendments to the Act state that the stabilization of prices was necessary to stabilize the economy and reduce inflation. § 202 Economic Stabilization Act of 1970. The power delegated to the President to control prices was expressly made temporary. The original act was to expire on February 28, 1971. P.L. 91-379, 84 Stat. 799 (Aug. 15, 1970). Short extensions were granted in two amendments that continued the grant of authority through May 31, 1971. P.L. 91-558, 84 Stat. 1468 (Dec. 14, 1970); P.L. 92-8, 85 Stat. 13 (March 31, 1971). In a third amendment to the Act, before the Executive Branch had invoked its authority under the Act and just prior to the expiration date, Congress extended the authority for a year until April 30, 1972. P.L. 92-15, 85 Stat. 38 (May 18, 1971). On August 15, 1971, Phase I went into effect. Shortly thereafter, the Administration sought amendments to the Act and its extension through April 30, 1973, because the Administration was satisfied that the goals of Phase II could not be reached by April 30, 1972; at that time it had assured the Senate Committee that the program would remain in effect only as long as necessary. See Hearings Before The Senate Committee on Banking, Housing & Urban Affairs on S.

2712, 92nd Cong., 1st Sess., at 17 (1971) (Testimony of Charles E. Walker, Under Secretary Department of The Treasury). During Phase III, Congress extended the Act for the final time for one more year. P.L. 93-28, 87 Stat. 27 (April 30, 1973). The final extension was to enable the President to complete the Phase III program of voluntary controls. See S.Rep.No.93-63, U.S. Code Cong. & Admin.News 1973, at p. 1300. The system of price and wage controls was clearly intended to be a temporary interruption in the free market system, justified solely by the need to halt the inflationary spiral. Once it was arrested and the pressures were tapered off, the President was to have no further authority to dictate wage and price levels. Even before the expiration of the Act, the President deemed mandatory controls no longer to be necessary and declared that the rate of inflation had been "significantly reduced." Executive Order No. 11695 (January 11, 1973).

Under Phase III voluntary price guidelines went into effect for sale of natural gas generally. However, those who had entered into a contract during Phase II were to remain contractually bound to the Phase II price term for the life of the contract unless some event other than the end of mandatory controls triggered a renegotiation provision. The effect of the Executive Order on the agreement between Allied and United, therefore, would be to continue the maximum Phase II price-term for five years. In declaring that renegotiation provisions were inoperative the President was concerned with the immediate and explosive inflationary impact that would be caused by the abrupt lifting of controls, which would be substantially intensified by existing contracts which provided for payments for goods or services at the controlled maximum fixed by Phase II controls during their existence, but which *also provided* for large increases in prices for goods or services to become effective at the moment Phase II controls ended. The invalidation of such renegotiations or price increases had the effect of contractually binding the parties to a price term negotiated

during a period of mandatory controls and dampening the immediate inflationary effect of the termination of Phase II.

█ Such a ban on renegotiation clauses was a legitimate attempt to further the purposes of the Act. A sudden increase in wage and price levels, resulting from permitting such renegotiations, would have an unstabilizing effect. If perpetuated, it could only be stopped by a reimposition of full controls, which the President had the power to do, but it would have spelled defeat for the effort to return to a normal economy. As time went on, however, and the nation had a year or so for post-controls readjustment and a return to a free economy, the blanket ban on renegotiation of Phase II prices was bound to have less and less relationship to promoting the purposes of the Act and would instead go on selecting the individuals who would remain subject to extended mandatory price controls beyond their termination point, not for any real economic or social reason or in the rational pursuit of necessary statutory purposes, but on the basis of the length of their contracts. It would at most operate as a kind of irrational punitive measure upon contracting sellers who as a small percentage of the people would still be subject to price controls long after everyone else in the nation was free of them. Under these circumstances the ban on renegotiation provisions extended for several years would be an arbitrary and overbroad interpretation of the exercise of imposing controls which Congress never intended and would impede the transition to freedom from controls, originally decreed for an emergency which the President had declared long since past.

Even assuming that the ban on renegotiation provisions was a legitimate exercise of the President's authority under the Act, it is eminently clear that such a ban cannot be given effect beyond the termination date of the Economic Stabilization Act. Section 218 states:

"The authority to issue and enforce orders and regulations under this title expires at midnight April 30, 1974, but such expiration shall not affect any action or pending proceedings, civil or criminal, not finally determined on such date, nor any action or proceeding based upon any act committed prior to May 1, 1974."

Upon expiration of the Economic Stabilization Act, the President issued Executive Order No. 11781 (May 6, 1974). In that order, the President continued the COLC for two months to bring pending proceedings to a close. Executive Order No. 11781 explicitly supersedes Executive Order No. 11695 "except to the extent necessary to carry out the functions and duties prescribed by this order." The provision in Executive Order No. 11695 rendering renegotiation provisions inoperative was not necessary to the completion of the functions detailed in Executive Order No. 11781. On June 18, 1974, recognizing that the only remaining authority under the Act was to dispose of actions pending prior to May 1, 1974 and to take the appropriate action regarding wages or prices charged prior to the termination of the Act, the President delegated the functions to the Secretary of the Treasury, abolished the COLC, and specified that the order was not to be construed as authorizing the imposition or reimposition of mandatory economic controls except with respect to enforcement activity related to prices charged prior to May 1, 1974. Executive Order No. 11695 was specifically revoked. Executive Order No. 11788 (June 18, 1974).

The termination of the Act, the implicit recognition in Executive Orders Number 11781 and 11788 that continuing wage and price control authority related solely to the period prior to May 1, 1974, and the revocation of Executive Order No. 11695 indicate that the ban on renegotiation provisions should not be given effect beyond the expiration of the Act and that Allied's § 210 claim should be limited to the period January 1, 1973 to May 1, 1974. Given the limited purposes of the Act this construction of the relevant Executive Orders and § 218 of the Act is consistent with congressional intent. Any extension of Phase II controls beyond termination of the Act

through the ban on renegotiation provisions would constitute an exercise of power going beyond that delegated to the President under the Act.

This court's affirmance of the district court opinion in *Delaware Valley Apartment House Owners Ass'n v. United States*, 350 F.Supp. 1144 (E.D.Pa.1972), *aff'd* 482 F.2d 1400 (Em.App.1973), is not contrary to this ruling. The plaintiffs in that case challenged the regulation governing the base rent determination for certain residential apartments, 6 C.F.R. § 301.208, on the ground that it was beyond the Price Commission's authority because the regulated rent term may extend beyond the termination date of the Act. To avoid this result, a landlord could request a rent increase of less than 8%. If the landlord limited the increase to less than 8%, he was exempt from the requirement in § 301.208 that he offer the tenant the option of a one-year lease at an 8% increase or a long-term lease of equal or greater duration than the expiring lease at a rate regulated by standards yielding a larger increase. As the district court noted, a landlord could be tied to a lease with a Phase II controlled rent for a period extending beyond the termination date of the Act. However, as the district court found, landlords were afforded a "reasonable choice" and could avoid the long-term effects of the regulations by curtailing their rent demands for the short term.

The ruling in the present case is not inconsistent with the holding in the *Delaware Valley* case because it is not based upon a determination that the Act prohibited all price control decisions that would have effect beyond the termination date of the Act. That case concerned a voluntary agreement to a controlled price for the long-term which was influenced by the allowance of a larger increase during the effective period of controls. Rather, at the time, December, 1972, that Allied and United entered into a new agreement covering the price for gas from 1973 through 1977, United legitimately believed that the "renegotiation" clause was a permissible, opera-

tive provision and that it would be bound to a controlled price only for the duration of mandatory controls. The President, however, chose to declare on January 11, 1973, that such renegotiation provisions were inoperative. The trade off and freedom of choice present in *Delaware Valley* are not present here. Although a legitimate exercise of presidential power at the time it was announced, the declaration that renegotiation provisions such as the one in this case are inoperative should not be given effect beyond the reason for its adoption. The expiration of the Act indicates that the ban on renegotiation provisions was no longer necessary because the goals of the Act had been achieved. The revocation of Executive Order No. 11695 should be construed as terminating the declaration that renegotiation provisions were inoperative and thereby permit United to charge an uncontrolled price after April 30, 1974.

This resolution of the cross-appeal renders the issue, whether there is a binding contract between the parties, crucial to the imposition of a Phase II price beyond January 11, 1973. If there is no contract, there is no inoperative renegotiation provision and United is not contractually bound to the maximum Phase II price. Without a contract, United's charges would be completely free of controls after January 11, 1973. *See California Molasses Co. v. California & Hawaiian Sugar Co.*, 551 F.2d 1230 (Em.App.1977). This court must, therefore, consider the issues presented on the appeal from the stay order.

■■■ It is the opinion of the court that the stay order must be vacated because whether or not the parties had entered into a binding contract is an issue to be decided as a matter of federal law. Although reference to similar state court decisions would be appropriate in making such a determination, the federal court is not bound by state law in interpreting the Executive Order, the relevant statutes and the regulations. The scope of Allied's federal claim depends directly upon interpretation of Executive Order No. 11695. The kind of agreements covered by the President's ban on renegoti-

ation provisions should not vary according to differing state laws, nor should the courts generally assume that the operation of a federal statute is dependent on state law. *Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943). The effect of the Phase II controls and Executive Order No. 11695 is nationwide and should be construed to treat similar legal relationships in a uniform manner. The desire for uniformity of application of the Stabilization Program is manifest in purposes which brought about the creation of this court.

To summarize: the stay order is vacated and the case is remanded to the district court with directions to limit Allied's § 210 claim to the period from January 1, 1973 through April 30, 1974. The district court is directed forthwith to determine whether Proposal A is a binding contract obligating United to accept the maximum Phase II price for the duration of the ban placed on the renegotiation provision by Executive Order No. 11695. If the district court concludes as a matter of federal law that United is so bound, it should proceed immediately to trial to determine the maximum price chargeable under Phase II and order any excess of price paid, reimbursed to the purchaser, or order any price remaining due, paid to the seller, as the case may be.

*It is so ordered.*